SAMUEL G. ADAMS & others *vs.* GRUNDY AND COMPANY, INCORPORATED.

Suffolk.    January 16, 1925. — April 17, 1925.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Sale. Contract,* Construction, Performance and breach.

At the trial of an action of contract by a Boston wool merchant against a dealer in Argentina wool, there was evidence tending to show the following facts in substance: The plaintiff caused a letter of credit to be issued for the defendant and purchased of the defendant Argentina wool of a certain designated grade, "equal in grade and staple to [a] previous purchase," at a certain price "CIF Boston." The defendant shipped the wool from Argentina, paying the freight and insurance to Boston, and his draft for the purchase price was paid through the letter of credit. The wool arrived in Boston in August, was examined by both the plaintiff and the defendant, and was agreed by them not to be up to grade because there were from fifteen to twenty per cent "off-sorts" in it, and the plaintiff then said he "could not accept said wool." A further agreement then was made between the parties whereby the wool, which had been put in storage at the plaintiff's expense, was sent to a mill of the defendant, there to be sorted carefully, the plaintiff to be

reimbursed at an agreed rate for the off sorts taken out, and the defendant then to comb the wool at the plaintiff's expense. As the work progressed, the plaintiff objected that the defendant was not taking out sufficient percentage of off sorts, and the defendant insisted that he was getting out all he could. The plaintiff, using samples furnished by the defendant, while the wool was being combed was trying to sell it to his customers. In October, the plaintiff sent other wool to the defendant to "blend through the wool you are combing for us." The final report on the sorting by the defendant was made in October and showed an average of only seven and one half percent of off sorts taken from the wool, and the plaintiff thereupon "notified the defendant that they could not accept said wool as sorted and elected to rescind said sale and demanded the repayment . . . of the purchase price of said wool and the charges incurred therewith." *Held*, that

(1) Under the C.I.F. contract, the title to the wool passed to the plaintiff when placed on shipboard in Argentina;

(2) The plaintiff, not having offered to return the wool when he first discovered that it was not up to grade, did not then become an unwilling bailee of it;

(3) There was no agreement that, after the contract as to sorting and reimbursement was made, the plaintiff should have a right to rescind;

(4) The plaintiff not having availed himself of his right to rescind under G. L. c. 106, § 58, but having made the arrangement for sorting by the defendant and reimbursement for off sorts taken out, could not recover in this action.

CONTRACT by plaintiffs doing business under the firm name of Adams and Leland, the declaration being in two counts, the second count being upon an account annexed and the first count setting out in detail a claim for the repayment of $252,013.70, the purchase price of certain wool bought by the plaintiffs from the defendant in Argentina and certain freight and other charges, the plaintiffs alleging that on arrival in Boston the wool was found not to be what the contract called for, that then the defendant agreed to sort it and take out the off sorts and to credit the plaintiffs for off sorts taken out; that the defendant did not take out the proper amount of off sorts, and thereupon the plaintiff "notified the defendant that they could not accept said wool as sorted and elected to rescind said sale and demand repayment to them of the purchase price of said wool and the charges incurred therewith." Writ dated January 12, 1921.

The plaintiff filed a declaration in set-off, and sought $32,631.83 for combing the wool and freight charges.

In the Superior Court, the action was tried before *Ray-*

*mond,* J. Material evidence is described in the opinion. A verdict was ordered for the defendant, and the action was reported to this court for determination upon the stipulation described in the opinion.

*S. L. Whipple,* (*E. C. Park* with him,) for the plaintiffs.

*C. F. Choate, Jr.,* (*R. Proctor* with him,) for the defendant.

PIERCE, J. This is an action of contract. The declaration, in two counts, seeks the repayment of the purchase price of five hundred bales of wool, sold the plaintiffs by the defendant, and of certain charges incurred and paid by the plaintiffs in connection therewith. At the close of the evidence the parties entered into the stipulation which follows: "It is hereby stipulated that the court having ordered a verdict for defendants on plaintiff's claim shall report the case on all the evidence for the consideration of the full court. If the ruling of the court that the plaintiff is not entitled to go to the jury be affirmed, judgment shall be entered for defendant on the plaintiff's claim. And judgment shall be entered for the defendant-plaintiff in set-off for the amount claimed in its set-off with interest as if a verdict had been rendered as of November 1, 1923. If the plaintiff was entitled on the evidence to have the plaintiff's case submitted to the jury, judgment shall be entered for the plaintiff for the amount claimed in the plaintiff's declaration with interest as if a verdict had been rendered for plaintiff as of November 1, 1923, and judgment against defendant on its claim in set-off." The presiding judge then directed a verdict for the defendant and reported the case to this court, in accordance with the terms of the stipulation.

The evidence material to the narrow issue set up in the declaration, in substance, is that on April 29, 1920, the plaintiffs, acting through a member of the firm, Harry P. Bradford, bought of William H. Grundy as the representative of William H. Grundy Company, Inc., and Grundy & Co. Inc., five hundred bales of Chubut wool "60/64s; estimated shrinkage 69%. Equal in grade and staple to previous purchase. 51½c cif Boston." In accordance with the sale note, the plaintiffs on the same day caused a letter of credit for $255,000 to be issued to the representative of the defend-

ant, Thomas A. Wood, Buenos Aires, Argentina. Wood later drew on a Boston bank for the purchase price; the draft so drawn for $248,708.43 was paid by the bank, and then, on October 5, 1920, the amount paid by the bank with interest, in all $249,330.20, was paid to the bank by the plaintiffs.

The wool arrived in Boston from Buenos Aires by steamer on August 22, 1920. It was put into the warehouse of Brown and Adams, by the direction of the plaintiffs, who advanced the freight charges to the steamship company on behalf of the defendant, and on their own behalf paid the cost of storage and insurance. The wool was invoiced in nine lots, and sample bales of each and every lot were brought to the warehouse of the plaintiffs for examination, twenty-one bales all told out of the five hundred. The examination, which was conducted by Bradford, warranted the claim that the wool was not "equal in grade and staple to previous purchase." A Boston representative of the defendant (Bennett), at the request of the plaintiffs' agent (Bradford), examined the wool and agreed with Bradford that "it was not equal to the first wool" for the reason that there were fifteen to twenty per cent "offsorts" in it. Bradford at this examination told Bennett "that . . . [he] could not accept that wool . . . [he] had a perfect right to reject that wool but . . . [he] didn't want to if . . . [he] could help it. . . . [His] reason for not wanting to reject the wool was not because the market had fallen, it was because . . . [he] thought that it might possibly be said that . . . [he] was trying to squeal on . . . [his] contract. What . . . [he] said to him in substance was that . . . [he] would like to reject the wool but didn't want to because it wouldn't look well if . . . [he] did."

Bennett, soon after, appeared at the office of the plaintiffs with a proposition from Grundy to the effect that the wool be sent to the mill of the defendant at Bristol, where the defendant would sort it carefully and reimburse the plaintiffs at the rate of fifty-one and one half cents a pound for the "offsorts" taken out; the defendant would then comb the wool and put it into "top" for the plaintiffs, the plaintiffs to pay the expense of combing and putting it into "top." After a

consultation with his partners, Bradford told Bennett he would make a trial shipment of one hundred bales and see how the shipment would be sorted out; that he could not accept the wool in the shape it was in but he was willing to send over one hundred bales to see if a satisfactory sorting of it at the mill could be made. On September 2, 1920, one hundred bales of wool, selected by taking twenty per cent as near as possible from each one of the nine lots, were sent to the mill at Bristol, with a letter enclosing a "memorandum covering 100 bales Chubut wools which you are to comb for our account." Bradford later went to the mill, examined the wool, and gave directions as to the sorting. He showed Grundy the "offsorts" and showed him what he wanted taken from the wool, what he thought was necessary to take out to make a good "60/64s" delivery. He estimated the wool contained fifteen to twenty per cent of "offsorts." Grundy did not think that amount needed to be sorted out. Bradford wanted it all sorted out; he showed the head sorter how he wanted it sorted out, and took wool in his hands, saying "take this out and leave that."

On September 20, 1920, Grundy sent Bradford a memorandum of sorting tests of the one hundred bales Chubut wool "sent us for combing." This test showed that eleven per cent of "offsorts" had been taken out. Bradford, on receipt of the memorandum, called Grundy on the telephone and said to him, in substance, that he did not think he was taking out enough "offsorts," that he was not satisfied and thought more should be taken out. Grundy answered that he had tried to do a very careful job of it and thought he had; that he thought he had done all that could be expected of him; and he said "You ship the balance of the wool down and I will try and be even more careful in making a good sort of that wool." Bradford said he would send down the four hundred bales on Grundy's assurance that he would be more careful in the future and sort out more of the inferior wool. He was emphatic in the statement that he wanted all the "offsorts" taken out and was not satisfied with the eleven per cent.

On September 23, 1920, the plaintiffs wrote the defendants

a letter "Confirming" the conversation over the telephone, and stated that they "were rather surprised" that Grundy & Co. "did not get out a greater percentage of 'off' grades" in sorting the wool sent. The letter continued, "However, on his [Grundy's] assurance that you felt you had made specially careful work in sorting this wool, we are sending you the balance of the line, 400 bales, and rely on you to sort this wool so as to make us a good marketable Top." The combing of the one hundred bales showed "60's—64's—70's" wool; "60/64's" being the grade covered by the contract, the "70's" being finer and more valuable. The memorandum classified the "60's," "64's" and "70's" as "10's" and "12's" mixed. The letter in reference to this mixture reads: "We understand that you have made a mixed 10's and 12's sort of this 100 bales together, and will comb them together. On the 400 bales that we are sending you please keep the 12's separate and make a separate combing of each sort. Comb them without oil." The letter also directed that the wool be combed so as "to make as few Noils as possible." Grundy on September 24, 1920, acknowledged the letter of September 23, and promised to comb without oil, with as lean a noil as possible, to keep the "10's" and "12's" separate and to comb them by themselves.

About September 27, 1920, Bradford received from Grundy samples of top and noils taken from the one hundred bale lot and wrote Grundy in reference to them as follows: "In examining the Top we find it to be somewhat 'nibby.' Cannot this defect be avoided because, as you well know, it is hard to sell 'Nibby' Top . . . . The Noils were very short and are somewhat defective, more so than other lots which we have recently had combed. We really think the wool should be sorted a little closer for this defect. 400 bales more of this wool is being shipped you and we certainly look to you to make the Top a little clearer than the sample first submitted." On September 28, 1920, the plaintiffs wrote the defendant enclosing a "memorandum for 400 bales and 1 bag Chubut wool which you are to comb for our account." The letter referred to that of September 27, repeated in substance what was said therein concerning the "Nibby" Top,

and concluded, "We want this Top brought out as clear as possible." On October 4, 1920, the defendant, in answer to the plaintiffs' letters of September 27 and 28, replied, ". . . we are really using more care than we would with our own wool of the same kind. As to the combing, under your instructions, the mill is trying to make the Noil as small a percentage as possible, and this of course, naturally carries with it the presence in the Top of more nibs than would be there if the Noil was taken out with more liberality, in the usual way." October 5, 1920, the plaintiffs wrote the defendant, "We told you to take out as much noil as consistent with making a good top and we certainly did not want the top spoiled by not taking out enough noil. The thought has occurred to us that you are not sorting out enough of the short wool and that it is the short wool that is making these nibs. We do not want the top spoiled and look to you to make us a good saleable top. . . . "

At the trial Bradford testified in reference to his letter of October 5: "When I saw the top come through poor and that he wasn't taking out enough noil, I naturally would shift my ground. They tried to follow my directions, — I hope they did." September 27, 1920, the plaintiffs wrote for a five pound sample of noils from the one hundred bales "C. O. 64." In relation to the sample sent the plaintiffs in response to this order, Bradford testified: "This five pound sample . . . we probably sent it to a customer. We were showing the noils that Mr. Grundy was combing out of this wool to customers and offering it for sale, treating it as our own wool that we had to sell. It was offered to a number of people and samples of the top and noil were submitted to customers as the top and noil that Adams and Leland had for sale." On September 30, 1920, the plaintiffs sent the defendant "1,000 sacks in which to put the top made from the 400 bales." On October 1, 1920, the plaintiffs sent the defendant to "blend through the wool you are combing for us" six bags of broken tops from other wool, not from wool bought from Grundy, and they were combed into the wool from the four hundred bales. Of this incident Bradford testified: "I never denied that they were

combing wool for me when I wrote that letter [of October 1]. I had no knowledge they were combing the four hundred bales. I supposed they were combing it right along, but I didn't know it. . . . I didn't see them to do it, but I had every reason to suppose they were doing it. . . . I didn't have any idea of repudiating the wool. . . . I didn't expect to have any such trouble as this. I intended on October first to treat this wool as our own and I gave him to understand that I treated it as our own on October first and for him to keep on combing it on condition he sorted the wool in the proper manner."

Before November 1, 1920, the plaintiffs ordered the defendant to comb in oil twenty-five thousand pounds top which would have to come in a "substantial degree" from the four hundred bales, No. "69." A sample of this combing was delivered to the plaintiffs about November 1. At different times during September, October and November the defendant, at the request of the plaintiffs, sent samples taken from the one hundred bale lot and from the four hundred bale lot designated as lots "64," "69" and "70"; some of these were delivered and some were shown to customers for the purpose of selling the wool. On November 16, 1920, the defendant sent, and the plaintiffs received on November 17, a report on sorting and combing the entire five hundred bales, with a credit memorandum of "offsorts" and a charge for combing and sorting. Bradford admitted the plaintiffs agreed to pay for the combing, and the sorting charge is covered by the stipulation of the parties hereinbefore set out. The report showed eleven per cent of "offsorts" for the one hundred bales and six and six tenths per cent for the four hundred bales — an average of seven and a half per cent. The plaintiffs then wired for samples of lots "69" and "70" and wrote for further samples on November 18 and 23, 1920.

On November 26, 1920, the plaintiffs wrote the defendant: "We could not accept the wool as originally shipped. We cannot accept the Top as you have made it." As regards the letter of November 26 Bradford testified: "I repudiated the whole contract without looking with any care at either

samples of top or noil or at the bulk of the goods that were in Grundy's warehouse. I didn't care anything about those things." "I made my repudiation on the sorting of the wool. I didn't repudiate the wool because the tops were not marketable. I simply repudiated the contract because the sorting report came in and showed they had taken out six and six tenths per cent instead of more. That is the whole basis of my repudiation of the contract. . . . I make no complaint about the top and noils as such. I admit they are good marketable tops and noils for the grade — a little on the low side, but still they might pass for 60/64s. They are fairly made top; they are not especially good. You might call them marketable and I so represented them. I repudiated the contract on the sorting report."

In this transaction the draft, which the plaintiffs were required to accept at the Second National Bank of Boston for account of the defendant's representative, was accompanied by a proper bill of lading and an invoice, and the defendant, on June 4, sent the plaintiffs a certificate of marine insurance, insuring the plaintiffs from "Buenos Aires to U. S. Atlantic port." It follows that the title to the wool sold the plaintiffs under their "cif" contract with the defendant passed to the plaintiffs when it was loaded on the steamer Hostillius, which left Buenos Aires on May 29, 1920, for Boston. *Smith Co. Ltd.* v. *Marano,* 267 Penn. St. 107; 10 A. L. R. 697, and cases collected at pages 701, 705. *Harper* v. *Hochstim,* 278 Fed. Rep. 102; 20 A. L. R. 1232, and note. *National Wholesale Grocery Co. Inc.* v. *Mann,* 251 Mass. 238.

The sale note, under the heading "Description," in substance provided that the wool sold is to be "Chubut 60/64s; estimated shrinkage, 69% equal in grade and staple to previous purchase." The sales act, G. L. c. 106, §§ 16, 18, provides: "Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description . . . ." "In the case of a contract to sell or a sale by sample — (a) There is an implied warranty that the bulk shall correspond with the sample in quality. (b) There is an implied warranty that the buyer

shall have a reasonable opportunity of comparing the bulk with the sample . . . ." The plaintiffs, upon the delivery of the wool at their warehouse soon after the arrival of the steamer on August 22, 1920, under G. L. c. 106, §§ 16, 18, were required within a reasonable time to ascertain whether the wool received was "Chubut, 60/64s" and whether it was "equal in grade and staple" to a previous purchase of two hundred bales; and to return promptly the wool if they elected to rescind the sale and receive back the money advanced on the draft. The evidence for the plaintiffs warranted a finding that the plaintiffs in proper time made a reasonable examination of the wool, and that the inspection showed that the five hundred bales of wool, taken as a whole, was not as fine quality as the wool referred to in the sale note. The plaintiffs, when they became aware that the wool was not of the quality they had purchased, or that it was not equal in grade and staple to the previous purchase, at their election, under G. L. c. 106, § 58, could have accepted the wool as conforming to the contract; or they could have returned or offered to return it to the defendant, in substantially as good condition as it was when they received it, and recover back the amount of their purchase money. *Dorr* v. *Fisher*, 1 Cush. 271, 274. *Skillings* v. *Collins*, 224 Mass. 275. *John Service Inc.* v. *Goodnow-Pearson Co.* 242 Mass. 594.

The plaintiffs for reasons which concerned their business reputation did not avail themselves of their right to rescind, but entered into an arrangement whereby the defendant undertook to sort the wool carefully and agreed to reimburse the plaintiffs at the price they paid for the wool for the "off-sorts" it took out, and then comb the wool for the plaintiffs at the usual charge for combing. The execution of this agreement involved necessarily a material change in the wool from a raw state into qualities which are described in the record as tops and noils.

The contention of the plaintiffs that the wool belonged to the defendant and that they were in the position of an unwilling bailee after they notified a representative of the defendant that they "could not accept said wool" is unsound. The title, which vested in the plaintiffs on the delivery of the

wool upon the steamer, could not revest in the defendant without its consent; and the plaintiffs could not become unwilling bailees of the wool before they had made an offer to the defendant to return the wool.   G. L. c. 106, § 58 (4) (5).

The facts disclosed by the record would not warrant a finding that the plaintiffs were given by the defendant a right to rescind at some future time because the wool differed in kind from the wool of the previous sale, or because it was not of the quality of the previous sale, if the defendant under the agreement to resort did not remove sufficient "offsorts" to make the wool conform to the quality and description required by the sale note.   The agreement was a new contract whereby, for their common advantage, the plaintiffs gave up their right to rescind, and the defendant undertook to resort the wool and to pay the plaintiffs for the "offsorts" removed the price which the plaintiffs had paid for "60/64s" wool when the wool in bulk was delivered on the steamer at Buenos Aires.   The plaintiffs not having elected to rescind the sale when it was ascertained by them that the wool differed in kind or in quality from the wool described in the sale note, and not having by contract with the defendant a right to rescind at the happening of a future event, cannot under either count of their declaration recover by way of repayment "the purchase price of said wool and the charges incurred therewith."

The ruling that the plaintiffs were not entitled to go to the jury was right.   It follows in accordance with the terms of the stipulation that judgment is to be entered "for defendant on the plaintiff's claim" and "for the defendant-plaintiff in set-off for the amount claimed in its set-off with interest as if a verdict had been rendered as of November 1, 1923."

*So ordered.*